Kelly FISKE

v.

MacGREGOR, DIVISION OF BRUNSWICK et al.

No. 82–413–Appeal.

Supreme Court of Rhode Island.

July 21, 1983.

---

Leonard DeCof, DeCof & Grimm, Providence, for plaintiff.

Joseph V. Cavanagh, Higgins, Cavanagh & Cooney, Providence, for defendants.

## OPINION

MURRAY, Justice.

This is an appeal from a Superior Court judgment awarding the plaintiff $2,100,000, plus interest, for personal injuries he sustained while playing in a high school football game. The plaintiff cross-appeals from that portion of the judgment wherein the trial justice, pursuant to our comparative-negligence statute, reduced the damages awarded in proportion to the amount of negligence attributable to the plaintiff. The damages reduced were awarded for the strict-liability, breach-of-implied-warranty, and negligence counts.

During the 1974 football season, plaintiff, Kelly Fiske, was a starting defensive back for the Cranston High School East football team. On the night of November 8, 1974, he participated in an interscholastic contest that pitted Cranston East against the Cumberland High School football team. With less than four minutes remaining in the first half of the game, plaintiff attempted to tackle an opposing ball carrier who was running for a touchdown. The two players collided and the following resulted: The ball carrier somersaulted into the end zone and scored a touchdown. The plaintiff, his tackle attempt unsuccessful, lay motionless on the ground, suffering from a spinalcord injury that rendered him permanently quadriplegic.

On September 22, 1975, plaintiff filed a complaint claiming that his injury was proximately caused by a defective design of the football helmet he had been wearing. The plaintiff's complaint alleged three counts against defendant, MacGregor Manufacturing Company, sounding in negligence, breach of implied warranty, and

strict liability in tort. He also claimed his injury was proximately caused by the negligent coaching and supervision by the varsity football coach of Cranston East and the Cranston School Committee.

This case endured through six years of discovery and pretrial motions before a jury was finally impaneled. The trial lasted for twenty-one days during which time thirty-six witnesses took the stand. After deliberating for three days, the jury, on special interrogatories, returned verdicts in favor of the coach and the school committee. The jury found against defendant on both the strict-liability and the breach-of-implied-warranty counts and answered that plaintiff had not assumed the risk of his injury. With respect to the negligence count, the jury found that "of all the negligence which proximately caused plaintiff's injuries," 40 percent was attributable to plaintiff and 60 percent was attributable to defendant. The total damages suffered by plaintiff were found to be $3,500,000. The trial justice reduced this award by the 40 percent plaintiff was found to be negligent. As a result, judgment was entered for plaintiff against defendant in the amount of $2,100,000, plus interest. The defendant now appeals from that portion of the judgment which found it liable for plaintiff's personal injuries. The plaintiff appeals from that portion of the judgment which reduced the jury's award by the percent plaintiff was found to be negligent.[1]

### I

### *Motion for a Directed Verdict*

The defendant first contends that the trial justice erred by not granting defendant's motion for a directed verdict at the close of all the evidence. The defendant alleges that plaintiff failed to adduce any competent legal evidence that the helmet was defective and unreasonably dangerous.

1. The plaintiff does not appeal that portion of the judgment which found no liability on the part of the coach and the school committee.

The controversy of this case revolves around the design of the helmet that was manufactured by defendant and worn by plaintiff on the night of his injury. The injury was described by the experts who testified as an axial-loading compression injury to the cervical spine.[2] The experts explained that the injury occurs when force is applied to the crown of the head while the cervical spine is in a straightened position and the body is traveling forward on the same axis as the straightened cervical spine. Because the vertebra of the back cannot be compressed, the force applied to the crown of the head causes the vertebra in the cervical area to suffer a subluxation.[3] This subluxation or displacement puts a compression pressure on the cervical spine and results in the type of injury sustained by plaintiff.

The plaintiff presented experts who testified that the face mask of the helmet, because of its dimensions, worked as a brace to the degree that plaintiff was unable to flex his head forward. As a result, plaintiff's cervical spine remained in the straightened position necessary for axial loading to occur. In response to the question of what prevented plaintiff's neck from flexing forward, that is, out of the straightened position, one of plaintiff's experts responded:

"A.  The only thing that I know that it is is the face mask.

"Q.  How did that work?

"A.  Okay. The face mask is constructed in a fashion that it comes out quite far and it goes down low. In other words, if an individual has this thing on his head and he tried to get full range of motion, he is going to be restricted by this particular member.

"Q.  Pointing to the lower bar of the face mask?

"A.  That is correct.

" * * *

"Q.  Doctor, you said that he got this injury because he could not flex all the way forward like I am doing with my neck touching my chin; is that right?

"A.  That's true.

"Q.  What prevented him? You said it was the face mask. How did the face mask prevent him from flexing all the way forward.

"A.  It impinged upon his chest. I can, if I were to go ahead and do this, I can touch my chest with my chin and in this particular case you cannot."[4]

In contrast to the above testimony, defendant presented an expert witness who testified that it was his "firm belief that the helmet-face mask combination in no way contributed in a primary role to the injury that this youngster sustained." A second expert witness of defendant elaborated on this point:

"Q.  Now when the cervical spine is in that alinement you described, susceptible to axial loading, does the neck have to be held by anything to produce this injury mechanism?

**2.** The cervical spine is that portion of the spine extending from the skull to the thoracic spine, which begins at the level of the shoulders.

**3.** One of plaintiff's experts testified that subluxation is a change in the relative line of the vertebral bodies with respect to one another.

**4.** Another of plaintiff's expert witnesses testified as follows:

"In my opinion, the design and configuration of the helmet and face mask in particular were such that the rigidly attached face mask limited the flexion motion of the tackler's head so that when the blow to the top of the head occurred, the musculature at the rear of the neck was unable to absorb any of the shock which is what normally happens and the head was being held like in a brace by the face mask so that the blow was in compression along the cervical spine which was held by the face mask in a slightly flexed position but was not allowed to flex more to absorb the energy, because of that, the fragmentation and the herniation of the disc occurred, and because of that, the subluxation of the vertebra of C4 vertebra occurred and the damage to the spinal cord and quadraplegia resulted."

"A. No, the neck is not held by anything, the muscles have put it there and the muscles are also under tension, especially in anticipation of the tackle and simply keeping the muscles in that tense state and having the head in that position is sufficient, it is exactly the same, we talk about a basketball injury. The basketball and nothing else holds the tip of the finger in position, the tip of the finger can move any way it wants but when the ball comes and it hits it in the axial loading position you can pop the joint and the same is true when this accident happened. In other activities, in diving, hit a sandy bottom, hit the bottom of a pool or in gymnastics you fall straight down and you hit, your head contacts cement, you get exactly the same mechanism and there is nothing holding the head.

"Q. Did the face mask in this case have anything to do with alining the head or holding the head in this axial alinement position, or the neck I should say. I think I botched the question, suppose I start over again, did the face mask play any part in placing the cervical spine in this alinement?

"A. No. The alinement is a voluntary alinement involving a small amount of motion on the neck of nodding, the face mask has nothing to do with it at all."

■ It is well established in this jurisdiction that a motion for a directed verdict will be denied if there is evidence supporting the nonmoving party or there is evidence on which reasonable minds could differ. *Marcotte v. Harrison*, R.I., 443 A.2d 1225, 1229 (1982). In considering whether or not such evidence exists, this court must do what the trial justice is called upon to do in the first instance. We examine the evidence and all inferences reasonably flowing therefrom in the light most favorable to the nonmoving party. We do not consider the credibility of the witnesses or the weight of the evidence. Applying this test to the evidence to which we have just referred and to the plethora of other evidence adduced in this case, we believe that a jury question existed regarding whether or not plaintiff was injured because of the defective design of the helmet-face mask. Therefore, we conclude that defendant's motion for a directed verdict was properly denied.

## II

### Motion for a New Trial

The defendant's next contention is that its motion for a new trial should have been granted because there is no competent evidence that supports the verdict.

■ As this court has said on numerous occasions and reiterated recently in *Kelly v. C.H. Sprague & Sons Co.*, R.I., 455 A.2d 1302 (1983), the trial justice, when considering a motion for a new trial,

"assumes the role of a super-juror. He or she independently reviews all of the material evidence in light of the charge to the jury, passing upon the weight of the evidence and assessing the credibility of the witnesses. If the trial justice then determines that the evidence and the reasonable inferences to be drawn therefrom are so nearly balanced that reasonable persons could arrive at different results in deciding the case, the new trial motion must be denied. If, however, the trial justice concludes that the jury's verdict is against the fair preponderance of the evidence, he or she must grant the motion for a new trial." *Id.* 455 A.2d at 1304.

■ Once the trial justice has reviewed the evidence in the manner described, his ruling on a motion for a new trial is entitled to great weight and will not be disturbed on appeal unless material evidence has been overlooked or misconceived. *Id.*

■ In the present case, the written decision on the new-trial motion establishes that the trial justice thoroughly reviewed

all the testimony. The defendant argues that the trial justice misconceived defendant's physical demonstration showing that the face mask does not impinge on the chest when the wearer's cervical spine is in the straightened position. Concerning plaintiff's physical demonstration, defendant argues that the trial justice overlooked the fact that plaintiff's model demonstrated that with his neck in the straight posture there is no "brace" effect between the face mask and the chest but rather a gap the width of four fingers. The defendant further points out that plaintiff's model, even with his arms and shoulder pads raised, had a range of flexion far beyond the straight-spine position. The defendant maintains that both of the demonstrations established the irrefutable physical fact that the design defect does not exist.

In response to both parties' courtroom demonstrations, the trial justice, in his written decision on the new trial motion, stated the following:

"There appeared to be obvious differences between the two demonstrations or displays, differences resulting from variations in body configuration, length of neck, fit of the helmet to the wearer, and the kind of build of the wearer and his body proportions, and also on the wearing of shoulder pads and the position of the arms at the time the neck was flexed, either with the arms raised, ready to tackle, or whatever. * * * None of these demonstrations, however, it seems to the court, showed what effect, if any, the bulling of the neck would have upon the mechanics of the face-mask, shoulder pads and chest of the wearer. By bulling of the neck the court refers to that technique testified to by all of the coaches and all of the players whereby the neck itself was seated or drawn down or shortened between the shoulders. To put it another way for clarity of the record making the neck the opposite of extension, contraction. This move was a standard move or motion by every player, trained to do it automatically, preparatory to going after a tackle or preceding

any body contact with another player on the basis of the court's recollection of the evidence.

"The jury and the court were left to draw their own conclusions or inferences as to the effect of this factor, the bulling of the neck; conclusions based on the evidence that was presented. Furthermore, it was the court's impression that all of the demonstrations as to position and distance between the facemask and the chest, all of them were conducted on persons in fixed positions, either standing or crouching over. This injury occurred during the heat of a very exciting play when the plaintiff was running after a ball carrier about to score, when the physical stress and exertion of the plaintiff was in the extreme when he lunged at and connected with a ball carrier. Whether or not these demonstrations that the court and jury observed, as helpful as they were, must be taken to have covered or shown all possible or probable positions of the apparatus and anatomy of the ball players is open to question. What the court is saying is that during the heat of excitement and the tremendous physical exertion of a football game it is quite probable, in fact it is entirely likely, that the configuration and distances we saw in these demonstrations could vary considerably."

On appeal defendant counters the trial justice's decision by claiming "that the design defect by definition makes dynamics and motions of the game irrelevant." However, defendant offers no authority for this proposition in law or in logic. We are concerned with whether or not the helmet is defectively designed for the conditions under which it is to be used, namely, a football game. For this reason we do not agree with defendant that the courtroom demonstrations conclusively establish the absence of the alleged design defect. Rather, we are of the opinion that the demonstrations, along with the conflicting testimony of the parties' experts, presented factual issues that were correctly left for the jury to

decide. The trial justice did not overlook or misconceive material evidence, nor was he otherwise clearly wrong in denying defendant's motion for a new trial.

## III

### Exclusion of Demonstrative Evidence

The defendant's final contention is that the trial justice abused his discretion and committed reversible error by excluding defendant's demonstrative evidence aimed at proving that the alleged defect did not exist.

Initially we should point out that our reading of the record on this point varies considerably with that of defendant. The record indicates that defendant's counsel requested that the court allow defendant to have a model wear plaintiff's helmet, while one of defendant's experts testified concerning plaintiff's theory. The plaintiff's counsel objected, and the jury was taken out of the courtroom so that the parties could be heard on the matter. The trial justice expressed his doubts as to whether the model closely resembled plaintiff "in body structure and weight and in size and in neck configuration." The defendant's counsel then expressed his desire to make an offer of proof, which the trial justice allowed. Instead of beginning his offer of proof on the physical similarities between the model and plaintiff, defendant's counsel commented as follows:

"MR. CAVANAUGH: And I would say, Your Honor, that we are prepared to have anyone with the exception of someone that has some physical abnormality, anyone in this courtroom or anyone out on the street put that helmet on and assume the position of a straightened spine and it will show that, there can be no restriction whatever from this face mask. That is an offer of proof but I am not doing that at the moment.

"THE COURT: That would be irrelevant. We are interested at what happened at this particular time.

"MR. CAVANAUGH: Your Honor please, the claim of the plaintiff is much broader than that. They are saying this helmet and face mask system was ineffectively designed because it impinged and restricted the football player, not just one in Rhode Island in 1974 of a particular build, but football players in the market who are going to be using this, this is what made it defective. They should have known this would impinge and restrict the motion, hold the football player's head and neck in this vulnerable alinement. That is the theory that they would like to see to the Court and jury and so I don't see at this time why the plaintiff should be so insistent that we get Kelly Fiske, who we can never duplicate here, in the same posture he was or build at the time but if we can take anyone generally like that, as I say we will take anyone in the courtroom and demonstrate it so long as he does not have a physical abnormality. At this time I would just like to show that someone who, and I will put the coach on to lay the foundation that this young man is substantially the same build as Kelly Fiske and his shoulders and his weight and the configuration of his neck and, as I say, I will have Dr. Burstein if it fits him, demonstrate it and I will have anyone else demonstrate it and it's just demonstrative evidence as to show the relative position of the head when it is wearing that helmet and the face mask when it is in the axial loading posture, that is all I want to show."

The defendant's counsel eventually made an offer of proof that persuaded the trial justice to permit the model to wear the helmet, although the trial justice did give the following cautionary instruction to the jury:

"THE COURT: Ladies and gentlemen, I have decided to permit the attorneys for the defendant, the attorney for the defendant, MacGregor, to demonstrate something to you, keeping in mind however that this young gentleman who is being used as a model in this case is not

Mr. Fiske and I require that you hear testimony as to the similarities and dissimilarities so much as we can establish them. So you will bear in mind that this is a demonstration and not a recreation of what happened the night of the game in question, you understand that, I am permitting this demonstration with that limitation. All right."

■ On appeal defendant claims that he attempted to perform the demonstration using randomly selected individuals but that the trial justice's ruling prevented any such attempt. Our reading of the record indicates that defendant simply stated to the court that he was prepared to have anyone in the courtroom or in the street serve as a model. The defendant's preparedness does not amount to a request that the court rule on the matter, nor does it amount to an attempt to perform the demonstration using randomly selected individuals. In any event, assuming arguendo that defendant did request a ruling that was denied by the trial justice, the record is devoid of any objection or request to make an offer of proof.

■ It is a well-established principle in this jurisdiction that this court will consider only those matters that have been properly raised in the court below. *Phelps v. Bay Street Realty Corp.,* R.I., 425 A.2d 1236, 1239 (1981); *Wickes v. Kofman,* 121 R.I. 698, 703–04, 402 A.2d 591, 594 (1979); *Aiudi v. Baillargeon,* 121 R.I. 454, 465, 399 A.2d 1240, 1246 (1979). Thus, a party who fails to assert his objections is deemed to have waived his rights on appeal. *Russell v. Kalian,* R.I., 414 A.2d 462, 465 (1980).

■ It also appears from his brief that defendant assigns as error the trial justice's cautionary instruction to the jury. Again we must find that defendant waived his right to raise this issue on appeal because he made no objection to the instruction.

We have considered all of the other contentions put forth by defendant and find them to be without merit.

## IV

### *Application of Comparative Negligence Principles to Strict Liability and Implied Warranty Theories*

We now address plaintiff's cross-appeal in the present case, which cross-appeal presents us with a question that has not yet been considered by this court. Essentially, we are asked to consider whether or not Rhode Island's comparative-negligence statute, G.L.1956 (1969 Reenactment) § 9–20–4, as amended by P.L.1972, ch. 18, § 1, should be applied to breach-of-implied-warranty actions and to strict-liability actions.

To reiterate, the jury in the present case found against defendant on both the strict-liability and breach-of-implied-warranty counts. On the negligence count the jury found defendant to be 60 percent negligent and plaintiff to be 40 percent negligent. The jury awarded plaintiff $3,500,000 in damages, but the trial justice entered judgment in the amount of $2,100,000, plus interest, which amount represents the damages reduced by the jury's finding of 40 percent negligence on the part of plaintiff. On appeal, plaintiff contends that the Legislature did not intend that § 9–20–4 be applied to reduce damages based on strict liability and breach of implied warranty.

■ In construing a statute, we are bound to give effect to the literal meaning when the meaning of the *text* is plain or clear and unambiguous. *Rule v. Rhode Island Dept. of Transportation,* R.I., 427 A.2d 1305, 1310 (1982). *Berberian v. Town of Westerly,* 119 R.I. 593, 597, 381 A.2d 1039, 1042 (1978). The statute in question, § 9–20–4, reads as follows:

"Comparative negligence.—In all actions hereafter brought for personal injuries, or where such injuries have resulted in death, or for injury to property, the fact that the person injured, or the owner of the property, or person having control over the property may not have been in the exercise of due care shall not bar a recovery, but damages shall be diminished by the finder of fact in proportion to

the amount of negligence attributable to the person injured, or the owner of the property or the person having control over the property."

The defendant and the trial justice both interpret the language, "all actions hereafter brought for personal injuries," to clearly and unambiguously include actions brought on the theories of strict liability and implied warranty. In opposition, plaintiff vehemently asserts that such an interpretation is in stark contrast to the legislative history of the statute. Among other things, plaintiff contends that the title given a 1972 public law [5] that amended § 9–20–4 limits the statute's application to negligence cases. In response to the obvious omission of the term "negligence" from the text of the statute, plaintiff maintains that "the statute by its terms calls for a comparison of *negligence* when the plaintiff was negligent. Necessarily his negligence must and can only be compared with the negligence of the defendants."

■ After a prolonged consideration and reading of this statute, we can only come to the conclusion that the language "all actions hereafter brought for personal injuries" includes actions brought on the theories of strict liability and breach of implied warranty,[6] as well as actions brought on a

negligence theory. Because we find that the statutory language is clear and unambiguous on this matter, we do not need to utilize the title as an aid to construe the statute. *Orthopedic Specialists, Inc. v. Great Atlantic & Pacific Tea Co.,* 120 R.I. 378, 388 A.2d 352 (1978). Our finding that the statute is clear and unambiguous would be more difficult had the drafters used more limited wording. However, the drafters deemed it necessary to use the language "in all actions," leaving no doubt in our minds that they intended to include actions in strict liability and implied warranty.[7]

Our decision today to apply comparative-negligence principles to strict liability and implied warranty [8] is well supported by other jurisdictions. *Westerman v. Sears, Roebuck & Co.,* 577 F.2d 873, 881 (5th Cir.1978); *Kennedy v. City of Sawyer,* 228 Kan. 439, 450, 618 P.2d 788, 798 (1980) (applying comparative negligence principles to implied-warranty claims). *See also Butaud v. Suburban Marine & Sporting Goods, Inc.,* 555 P.2d 42, 46 (Alaska 1976); *Daly v. General Motors,* 20 Cal.3d 725, 737, 575 P.2d 1162, 1169–70, 144 Cal.Rptr. 380, 387 (1978); *West v. Caterpillar Tractor Co.,* 336 So.2d 80, 90 (Fla.1976) (applying comparative-negligence principles to implied-warranty claims). The state of Mississippi, which has

**5.** The title of P.L. 1972 ch. 18 reads as follows:
"AN ACT Providing for the Finder of Fact to Diminish the Damages in Proportion to the Amount of Negligence Attributable to the Person Seeking Damages in Negligence Cases.

**6.** We should note that G.L. 1956 (1969 Reenactment) § 9–20–4, as amended by P.L. 1972, ch. 18, § 1, applies to cases brought for implied breach of warranty only if the damages sought are for personal injuries sustained. If the action is brought for damage to the product itself, § 9–20–4 does not apply. *See Peterson v. Bendix Home Systems,* 318 N.W.2d 50 (Minn. 1982).

**7.** A noted commentator has stated the following with respect to § 9–20–4:
"It is important to remember that this problem of whether a court can utilize a comparative negligence statute on strict liability does not arise in states such as Arkansas, Maine, Mississippi, Nevada, or Rhode

Island where statutes do not contain any words of limitation such as 'to recover damages for negligence.'" Schwartz, *Comparative Negligence* § 12.1 at 196 (1974). The following states have statutes that contain the term negligence: Connecticut, Colorado, Georgia, Hawaii, Idaho, Kansas, Massachusetts, Minnesota, Montana, New Hampshire, New Jersey, North Dakota, Ohio, Oklahoma, Pennsylvania, South Dakota, Texas, Utah, Vermont, Wisconsin and Wyoming.

**8.** We must point out that the First Circuit Court of Appeals, in *Roy v. Star Chopper Co.,* 584 F.2d 1124 (1st Cir.1978) did not anticipate our holding today wherein it assumed that Rhode Island law requires that a jury should not be instructed on comparative negligence when only an implied-warranty claim is brought. The *Roy* holding was based upon *Richard v. Hood & Sons, Inc.,* 104 R.I. 267, 243 A.2d 910 (1968), which was a food products case that preceded the enactment of the comparative negligence statute.

the same comparative-negligence statute as our own, has had that statute interpreted by a federal court to allow its application to strict-liability claims. *Johnson v. William C. Ellis & Sons Iron Works, Inc.*, 604 F.2d 950, 960 (5th Cir.1979); *Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276, 290 (5th Cir. 1975). Moreover, there are jurisdictions that have applied comparative-negligence principles to strict-liability claims despite the presence of comparative-negligence statutes that are limited by their terms to actions for negligence. *Sun Valley Airlines, Inc. v. Avco-Lycoming Corp.*, 411 F.Supp. 598, 663 (D.Idaho 1976); *Dippel v. Sciano*, 37 Wis.2d 443, 462, 155 N.W.2d 55, 64 (1967) (held that strict liability in tort is the equivalent of negligence per se; therefore, application of comparative negligence in such cases would be appropriate) *Contra Correia v. The Firestone Tire & Rubber Co.*, 388 Mass. 342, 446 N.E.2d 1033 (1983) (rejecting the negligence-per se analysis); *see also Thibault v. Sears, Roebuck & Co.*, 118 N.H. 802, 813, 395 A.2d 843, 848 (1978) (held that the comparative negligence statute did not apply to strict-liability cases because it is confined by its term to actions for negligence; however, the court further held that strict liability is a judicially created doctrine to which the principal of comparative causation will apply.) *Suter v. San Angelo Foundry & Machine Co.*, 81 N.J. 150, 160, 406 A.2d 140, 145 (1979) (held that phrase, "in an action * * * for negligence" should not be read literally so as to refer only to traditional negligence tort actions.) Fortunately, because of the broad language in our comparative negligence statute, we do not need to engage in any such creative analysis. Nonetheless, the existence of these cases can only lend support to our decision.

We think it important to note an unfair and inequitable result that would occur were we to decide differently. If the comparative-negligence statute only applied to negligence actions, a defendant manufacturer found liable in strict liability or implied warranty could not have the damages apportioned because of plaintiff's culpable conduct. Ironically, defendant manufacturers found liable in negligence would have the damages apportioned, despite the fact that their conduct was clearly more culpable than the conduct of those defendants found liable in strict liability or implied warranty. We believe that the just outcome of a case should not be determined by adroit pleading or semantical distinctions. A defendant's culpability is the basis for an award of damages, whether that culpability is denominated negligence, strict liability, or breach of warranty. Similarly, a plaintiff's culpable conduct is the basis for an apportionment of those damages. In the present case there is a finding of fact by the jury in regard to plaintiff's culpability which cannot be dismissed by adverting to semantics.

In his brief, plaintiff relies on a variety of Rhode Island cases to support the position that comparative-negligence principles should not be applied to strict liability and implied-warranty actions. Our examination of these cases leads us to conclude that plaintiff's reliance is misplaced.

The plaintiff relies on our decision in *Young v. Coca-Cola Bottling Co.*, 109 R.I. 458, 287 A.2d 345 (1972), to support his contention that the contributory negligence of a plaintiff should not be considered in an implied-warranty action.[9] While we agree with plaintiff's recitation of the holding in *Young*, we disagree with his assertions that it is controlling precedent for the case before us. In *Young*, this court was presented with the narrow question of the applicability of contributory negligence as a bar to an action based upon G.L.1956 (1969 Reenactment) § 6A–2–315, which dealt with the implied warranty of fitness of a food prod-

---

**9.** In his brief, plaintiff finds significance in the fact that our decision in *Young v. Coca-Cola Bottling Co.*, 109 R.I. 458, 287 A.2d 345 (1972), issued six months after the enactment of § 9–20–4. However, what plaintiff fails to re-alize is that the trial in *Young* took place in 1970, before any type of comparative-negligence legislation existed. Therefore, neither party raised any comparative negligence issues on appeal.

uct for human consumption. In the present case, we are not presented with the question of whether or not such a harsh doctrine should apply. Fortunately, with the advent of comparative-negligence legislation, the law in this state attempts to look at the relative fault of both parties and to apportion the award accordingly. For these reasons, we find that our decision in *Young* does not control in the present case.

The plaintiff also relies on our decision in *Kennedy v. Providence Hockey Club Inc.,* 119 R.I. 70, 376 A.2d 329 (1977). He correctly recites the law in this jurisdiction when he states that Rhode Island has refused to allow the doctrines of assumption of the risk and contributory negligence to become muddled. *Id.* In *Kennedy* we clearly distinguished the two doctrines:

"As we have defined assumption of the risk, the concern is with *knowingly* encountering the danger. This is to be contrasted with *negligently* encountering a risk and falling victim, at one time in our legal history, to the defense of contributory negligence. It seems to us that one who "sees, knows, understands and appreciates" what he is doing, *D'Andrea v. Sears, Roebuck & Co., supra,* [109 R.I. 479, 287 A.2d 629], is worlds apart from one who unwittingly and unsuspectingly falls prey to another's negligence. In the former instance the plaintiff can be said to have consented to the possibility of harm, whereas in the latter situation he has failed to assess accurately his situation and the ramifications of his own action." *Kennedy,* 119 R.I. at 76, 376 A.2d at 333.

The plaintiff is also correct when he states that the enactment of our comparative-negligence statute, § 9–20–4, did not dissolve the distinction. *Kennedy,* 119 R.I. at 76, 376 A.2d at 333. However, what plaintiff fails to realize is that the two doctrines can coexist despite the fact that they do not overlap. Each doctrine concerns a different type of culpable conduct on the part of a plaintiff, one being a knowing encounter with danger and the other a negligent encounter with a risk or danger. In *Kennedy,* both doctrines were applied to a negligence count, and it was found, through the granting of summary judgment, that the plaintiff's conduct more closely resembled a knowing encounter with danger and therefore assumption of the risk should apply.

In the present case we see no reason why the same type of application should not be made. The jury, in a strict-liability action or an implied-warranty action, should be able to consider a plaintiff's negligent encounter with danger if it decides that plaintiff's conduct does not reach that level of culpability that amounts to a knowing encounter with danger, that is, assumption of the risk. The damages should then be reduced by the percent the plaintiff was found to have been negligent. The contention that such a comparison amounts to mixing apples and oranges is nothing more than an argument based on semantics. Adhering to such artificial distinctions would result in a windfall for plaintiffs, in that their conduct, however culpable, could not be taken into account as long as it fell short of their assuming the risk. In light of the difficulty of proving that a plaintiff knowingly encountered a danger, and in consideration of the harsh result that occurs if the proof is successful since the action would be completely barred thereby, we feel that the application of comparative-negligence principles to strict liability and implied warranty achieves a fair and equitable result in the apportionment of damages.

For the stated reasons, the defendant's appeal is denied, the plaintiff's cross-appeal is denied, and the judgment appealed from is affirmed. The papers in this case are remanded to the Superior Court.

SHEA, J., did not participate.