**Marilyn CASTRIGNANO**

*v.*

**E.R. SQUIBB & SONS, INC.**

No. 87–306–M.P.

Supreme Court of Rhode Island.

Aug. 3, 1988.

Anthony T. Jackvony, Jackvony, DiMitri & Shapira, Providence, for plaintiff.

George M. Vetter, John Marks, Brooks R. Magratten, Vetter & White, Inc., Providence, Roxanne Wilson, Santa Monica, Cal., for defendant.

## OPINION

FAY, Chief Justice.

This case was initiated in the United States District Court for the District of Rhode Island. The plaintiff, Marilyn Castrignano (Marilyn), sought to recover damages for injuries that she allegedly incurred in utero when her mother ingested diethylstilbestrol (DES), which the plaintiff claimed was manufactured by the defendant, E.R. Squibb & Sons, Inc. (Squibb).[1]

The Federal District Court conducted a jury trial that held Squibb strictly liable in tort and liable for breach of implied warranty of merchantability. After the verdict the trial judge, Chief Judge Francis J. Boyle, acting pursuant to Rhode Island Supreme Court Rule 6, sua sponte certified three questions to this court concerning

---

**1.** The testimony indicated that DES is a synthetic substance that produces some of the effects that the natural hormone estrogen produces. It is not a true estrogen. Currently it is used for many purposes, including treating menopausal symptoms, breast cancer, senile vaginitis, and suppressing lactation. In the past it was used to prevent threatened or habitual abortions and premature labor. This use, however, is now prohibited. *See* Sloane–Dorland Annotated Medical–Legal Dictionary 202–03 (1987).

liability for injuries caused by prescription drugs. The certified questions are as follows:

"1. Does the State of Rhode Island recognize an action for damages for personal injuries in the circumstances presented in this action based on theories of strict liability in tort and breach of warranty of merchantability?

"2. Does comment (k) to § 402A, Restatement of Torts apply in Rhode Island to an action for damages for personal injuries in the circumstances presented in this action in an action based upon theory of strict liability in tort?

"3. If comment (k) applies to this type of action, is its application to the prescription drug DES a matter of law or a question of fact, and, if a question of fact, which party has the burden of proof?"

Since Judge Boyle asked our court to consider the specific facts of this case when answering the certified questions, a discussion of the facts is necessary.

Marilyn's complaint alleges she has suffered physical abnormalities of her reproductive system that have caused her to suffer miscarriages, infections, and other complications because of her exposure to DES in utero. The jury trial against Squibb began in 1986.

The facts elicited at trial are as follows. Susan Silvestri, Marilyn's mother, conceived Marilyn on August 15, 1953. Doctor Thomas Fogarty was Mrs. Silvestri's physician. In November 1953 Mrs. Silvestri experienced some cramping. The medical records that Dr. Fogarty kept indicated that on November 5 he prescribed progesterone for Mrs. Silvestri.[2]

Another notation in the medical records indicated that Dr. Fogarty prescribed Stilbetin for Mrs. Silvestri. Stilbetin is Squibb's trade name for DES. The date of the medical-record notation was somewhat illegible and seemed to indicate that Stilbe-

tin was prescribed on either the 1st or the 10th of December. Considering both of these dates, calculations established that Mrs. Silvestri began taking DES between the sixteenth and eighteenth weeks of gestation. She continued to take DES each day throughout her pregnancy. Mrs. Silvestri testified that Dr. Fogarty told her that he prescribed DES to prevent her from having a spontaneous abortion or, in layman's terms, a miscarriage.

Several of plaintiff's doctors testified that Marilyn's various physical problems were related to DES. They reached this conclusion because of the particular constellation of her symptoms. Although each symptom could occur in the general female population, when they occur in the same person they signal DES exposure. These doctors also testified that at the time Dr. Fogarty prescribed DES to Mrs. Silvestri, several studies were published that should have put Squibb on notice that DES injured the reproductive systems of fetuses exposed to the drug. Furthermore they noted that in 1971 the FDA banned the use of DES for the prevention of spontaneous abortions.

Squibb's witnesses, on the other hand, testified that all the problems that Marilyn alleges were caused by DES can be found in women who were never exposed to DES. They also stated that Mrs. Silvestri took DES after the time when it could have adversely affected the development of Marilyn's reproductive system. No damage could occur from DES exposure during the eighteenth and nineteenth weeks of gestation but rather only during the third through the fourteenth weeks of gestation. Squibb's experts also insinuated that Mrs. Silvestri's ingestion of the prescribed progesterone could have caused the abnormalities in Marilyn's reproductive system.

Alternatively Squibb's experts testified that regardless of whether Mrs. Silvestri ingested DES, Squibb cannot be held liable because in 1953 it had no reason to know of the drug's alleged adverse effects. They

---

**2.** Progesterone is a hormone that prepares the uterus for the reception and development of the fertilized ovum. One of its uses is treating

threatened abortions. *See* Sloane–Dorland Annotated Medical–Legal Dictionary 580 (1987).

noted that in 1947 the Federal Drug Administration (FDA) approved the use of DES for the prevention of miscarriages.[3] Contradicting the publications cited by plaintiff, Squibb's experts argued that none of the research available in 1953 reasonably established that a human female's exposure to DES in utero could damage her reproductive system. Without any reason to know of any side effects, they argue, they cannot be held liable.

After plaintiff presented her case, the trial judge dismissed the claims based on res ipsa loquitur, breach of express warranty, and misrepresentation. Opting to let the case proceed to the jury before ruling on the motion for a directed verdict, the trial judge reserved ruling on the remaining counts of negligence, strict liability, implied warranty of merchantability, and implied warranty of fitness for a particular purpose.

The jury returned a verdict against Squibb on the strict-liability and implied-warranty-of-merchantability counts but ruled in Squibb's favor on the remaining counts. Squibb immediately filed a motion for a new trial notwithstanding the verdict. Squibb argued that in the charge to the jury, the trial judge failed to exclude prescription drugs from strict-tort liability pursuant to the Restatement (Second) *Torts*, § 402A, comment k (1965). In the instructions the trial judge did not recognize a comment-k exception for prescription drugs but instead instructed the jury that Squibb would be strictly liable if the drug was defective and unreasonably dangerous according to an ordinary consumer's expectations. He further instructed that in order to make this determination, the jury must employ a risk-benefit analysis in light of the information available at the time the drug was taken because drugs are by nature dangerous substances. Upon considering Squibb's motion, the trial judge noted that the application of comment k to prescription-drug liability had not yet been addressed in Rhode Island. He therefore certified these questions to our court.

To summarize briefly this court's answers to the certified questions, we rule:

1. Based on the facts of this case Rhode Island law recognizes actions for damages for personal injury based on the theories of strict liability in tort and breach of the implied warranty of merchantability.

2. In a tort action comment k is a defense to an allegation of design defect. Comment k, however, is not a defense to an allegation of failure to warn. Comment k also is a defense for liability under the contract theory of breach of implied warranty of merchantability.

3. The application of comment k is a mixed question of law and fact. The defendant who uses comment k as a defense bears the burden of proving that the comment applies. If reasonable minds could only reach one conclusion, the judge may rule on comment k's application. Otherwise, the question should be submitted to the jury.

The defendant correctly contends that Rule 6 of the Supreme Court Rules imposes no absolute duty on this court to answer the certified questions. *Jefferson v. Moran*, 479 A.2d 734, 738 (R.I.1984). We, however, shall respond to the questions to clarify the law of Rhode Island on these issues. To analyze the issues at hand logically, we shall bifurcate the first question and address the strict-liability-in-tort issue in full. Second we shall address the issue of whether the breach of the implied warranty of merchantability is an appropriate theory of recovery for prescription-drug cases.

I

STRICT LIABILITY IN TORT

Rhode Island recognizes a cause of action for personal injuries caused by

---

3. The testimony indicated that in 1941 the FDA approved DES for conditions associated with menopause. A supplemental application for permission to use DES to treat threatened or habitual abortions was approved in 1947. Finally in 1951 the FDA removed DES from new-drug status; FDA removal of a drug from new-drug status is the means by which the FDA generally recognizes a drug as safe and effective for its indicated purposes.

prescription drugs based on the theory of strict liability in tort. We see no reason why strict liability should not provide a theory of recovery to Marilyn for injuries allegedly incurred by the effects of a prescription drug.

Before we address the comment-k-exemption issue, we shall review the status of strict-liability law in Rhode Island. In the seminal case of *Ritter v. Narragansett Electric Co.*, 109 R.I. 176, 283 A.2d 255 (1971), this court adopted the concept of strict liability in tort and cited with approval § 402A of the Restatement (Second) *Torts*. This section provides:

"Special Liability of Seller of Product for Physical Harm to User or Consumer

(1) One who sells any product in a *defective condition unreasonably dangerous* to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller." (Emphasis added.)

This court stated that the concept of strict liability in tort contemplates that there must be a defect in the design or manufacture that makes the product unsafe for its intended use. *Ritter*, 109 R.I. at 190, 283 A.2d at 262 (stove); *see Fiske v. MacGregor, Division of Brunswick*, 464 A.2d 719, 723 (R.I.1983) (football helmets). We further extended strict liability to cover cases in which the manufacturer failed to warn of its product's dangerous propensity. *Thomas v. Amway Corp.*, 488 A.2d 716, 722 (R.I.1985) (liquid soap). Under these theories of strict liability, if one of these

three types of defects appears in the product and that defect renders the product unreasonably dangerous in spite of all reasonable care exercised by the manufacturer, then the manufacturer is liable for that defect. *Ritter*, 109 R.I. at 190, 283 A.2d at 262.

To determine whether the product would be deemed "defective" under § 402A, this court embraced the consumer-expectation test. This approach seeks to protect the consumer or user who was unaware of the danger involved in using a product in a way that it was intended to be used. *Ritter*, 109 R.I. at 191, 283 A.2d at 263; *see Thomas v. Amway Corp.*, 488 A.2d at 722. Furthermore, we defined the term "unreasonably dangerous" to mean that "the defect in the product establishes a strong likelihood of injury to the user or consumer thereof." *Ritter*, 109 R.I. at 191, 283 A.2d at 263. These elements are crucial for the plaintiff to recover from a manufacturer under § 402A, regardless of the manufacturer's fault.

This court also has adopted several of the reporter's comments to § 402A that explain how the section should be applied. *See Thomas v. Amway Corp.*, 488 A.2d at 722 (comment j); *Brimbau v. Ausdale Equipment Rental Corp.*, 440 A.2d 1292, 1297 (R.I.1982) (comment f); *Romano v. Westinghouse Electric Co.*, 114 R.I. 451, 456, 336 A.2d 555, 558 (1975) (comment m); *Ritter*, 109 R.I. at 190, 283 A.2d at 262 (comment g). We, however, have yet to adopt comment k, which applies to prescription drugs.

■ Comment k recognizes that certain products have dangers associated with their use even though they are manufactured and used as intended. It provides that those products that are deemed "unavoidably unsafe" should be exempted from the no-fault strict-liability analysis of § 402A. Comment k provides as follows:

"*Unavoidably unsafe products*. There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of

drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk."

This comment provides a risk-benefit test for products that, given the present state of human knowledge, are incapable of being made safe for their intended use. Products that satisfy the risk-benefit test are deemed unavoidably unsafe. These products, especially drugs, will not be considered defective and unreasonably dangerous under § 402A because their known or perceived benefits exceed their known or perceived risks. Therefore, the availability and marketing of these products is justified, notwithstanding the risk.

The authors of the comment try to demonstrate which types of drugs should be excluded from strict-liability analysis through various examples. The authors state that the comment's exemption should apply to drugs, like the rabies vaccine, whose harmful side effects are known but whose benefits far outweigh the known risks. Such drugs, when properly manufactured and accompanied by a proper warning, will not be subject to strict liability. The rabies vaccine is an easy case in which the benefits of the drug outweigh its known risks. Other cases, however, are not so clear cut. The authors also state that this exemption should apply to new and experimental drugs that possess obvious yet undefined dangers because the perceived benefits of the drugs nonetheless justify their marketing. The comment provides that these new drugs should not be held to a standard of strict liability in light of the public policy favoring the availability of such products.

Although the comment cites examples, its language does not definitely establish the boundaries of its exemption. The comment suggests that a drug properly prepared and marketed, and accompanied by proper warnings when the situation calls for it, cannot be subject to strict liability when it satisfies the risk-benefit analysis. Satisfying this standard qualifies a drug as unavoidably unsafe. Although the comment speaks of proper warnings, its language does not address exempting drugs from strict liability for failure to warn of the dangers created by their use. We conclude that this exemption applies only to allegations of a defective design. *Toner v. Lederle Laboratories*, 112 Idaho 328, 336, 732 P.2d 297, 305 (1987); *Feldman v. Lederle Laboratories*, 97 N.J. 429, 447–48, 479 A.2d 374, 383–84 (1984). In order to avoid liability for failure to warn, the manufacturer must pass the test enunciated under comment j, which was embraced by this court in *Thomas*. *Thomas v. Amway Corp.*, 488 A.2d at 722; *see Feldman*, 97 N.J. at 449–58, 479 A.2d at 385–89; *see also Toner*, 112 Idaho at 336, 732 P.2d at 305.

■ Having adopted comment k, we must next decide the scope of its protection by defining what drugs comment k should

exempt from design-defect liability. Some courts, most recently the California Supreme Court, have ruled that public policy requires that comment k apply to all drugs as a matter of law.[4] *Brown v. Superior Court*, 44 Cal.3d 1049, 1060–1062, 245 Cal. Rptr. 412, 418, 751 P.2d 470, 477 (1988). Applying the comment-k risk-benefit test to determine prescription drug liability is necessary because of the important public interest in the development, availability, and reasonable price of drugs. *Id.* The strict-liability test stated in § 402A does not foster these interests. The threat of the imposition of strict liability, even on a case-by-case basis, would undermine the public interest in the development and availability of drugs. *Brown*, 44 Cal.3d at 1060–1062, 751 P.2d at 477, 245 Cal.Rptr. at 418. Therefore, the risk-benefit test determines responsibility for all prescription drugs.

Other courts prefer to apply comment k on a case-by-case basis. *See, e.g., Toner*, 112 Idaho at 340, 732 P.2d at 309; *Feldman*, 97 N.J. at 447, 479 A.2d at 383. These courts reason that prescription drugs are important products but do not deserve a complete exemption from strict liability. These courts vary in their methods of determining whether a drug is unavoidably unsafe.

Although both approaches have merit, we believe the societal interest in ensuring the development and marketing of prescription drugs will be adequately served by extending comment-k protection to prescription drugs on a case-by-case basis. We therefore adopt the case-by-case approach to determine whether a prescription drug is exempt from strict liability for defective design.

## A

### Defective Design

Initially we reject defendant's specious contention that a prescription drug, a fixed chemical composition, cannot be defectively designed because there are no alternatives to its configuration. The defendant's interpretation of the design-defect theory is too restricted, especially since there may be alternative drugs available that could replace the drug with the dangerous side effects. *See Brown*, 44 Cal.3d at 1062–1063, 751 P.2d at 478, 245 Cal.Rptr. at 419.

■ With an allegation of defective design, it must be determined whether the drug is exempt from no-fault liability pursuant to comment k. In order to qualify for a comment-k exemption, the apparent benefits of the drug must exceed the apparent risks, given the scientific knowledge available when the drug was marketed. If the benefits outweigh the risks, then recovery for design-defect liability is precluded. If, however, the apparent risks exceed the apparent benefits, then the product is not exempt from design-defect liability and will be subject to the traditional design-defect analysis set forth in § 402A.

■ Establishing design-defect liability under § 402A requires only that the product be defective and unreasonably dangerous. Traditional strict-liability analysis uses the "consumer expectation" test to determine whether the defective condition of the product renders it unreasonably dangerous. The test is harsher than the risk-benefit standard that qualifies a drug for the comment-k exemption. Therefore, if the facts do not support a comment-k exemption, the traditional analysis, which focuses on the product's defects rather than the reasonableness of the manufacturer's decision to distribute the drug, determines liability.

■ We must next decide whether the judge or the jury will determine if the comment-k exemption applies to a drug. Comment k's applicability is a mixed question of law and fact. *Toner*, 112 Idaho at 333 n. 4, 732 P.2d at 302 n. 4. Courts

---

4. Some cases have established a standard for ruling that a prescription drug is exempt from strict liability as a matter of law. These cases hold that a drug properly tested, labeled with appropriate warnings, approved by the FDA, and marked properly under federal regulation is as a matter of law a reasonably safe product absent proof of incomplete, inaccurate, or fraudulent information furnished by the manufacturer in connection with federal approval or later revisions thereof. *See McDaniel v. McNeil Laboratories, Inc.,* 196 Neb. 190, 201, 241 N.W. 2d 822, 828 (1976); *Leibowitz v. Ortho Pharmaceutical Corp.,* 224 Pa.Super. 418, 433–34, 307 A.2d 449, 458 (1973).

generally recognize that evidence must be heard in order to determine if the exemption applies. *Id.* at 340, 732 P.2d at 309. Some courts let the judge make this ruling as a matter of law, *see Johnson v. American Cyanamid Co.,* 239 Kan. 279, 286, 718 P.2d 1318, 1323–24 (1986), whereas others submit this question to the triers of fact, *see Ortho Pharmaceutical Corp. v. Heath,* 722 P.2d 410, 414 (Colo.1986). Some courts decline addressing this issue. *Toner,* 112 Idaho at 339–40 n. 9, 732 P.2d at 308–09 n. 9; *Feldman,* 97 N.J. at 448, 479 A.2d at 384.

This court, however, will take a different approach. We recognize that some drugs, like the rabies vaccine, definitely deserve the comment-k exemption. If a trial judge concludes that reasonable minds could not differ in deciding that a drug's benefits exceed its risks, then as a matter of law the trial judge can extend comment k's protection to that drug. If, however, the judge finds that an application of the risk-benefit analysis allows reasonable minds to differ in their conclusions, then the trial judge should submit the issue to the trier of fact. *See AAA Pool Service & Supply Inc. v. Aetna Casualty & Surety Co.,* 479 A.2d 112, 115 (R.I.1984); *see also White v. Wyeth Laboratories, Inc.,* Nos. 52108, 52564 (Ohio App. July 30, 1987) (available on 1987 WL 14953).

■ In these cases the plaintiff will need only to establish that the drug was defective and unreasonably dangerous. The defendant must establish comment k as an affirmative defense. *Belle Bonfils Memorial Blood Bank v. Hansen,* 665 P.2d 118, 122–23 (Colo.1983); *Toner,* 112 Idaho at 338, 732 P.2d at 307; *Shackil v. Lederle Laboratories,* 219 N.J.Super. 601, 618, 530 A.2d 1287, 1296 (1987). This approach burdens the defendant with proving that the benefits outweighed the risks at the time the product was prescribed for the plaintiff. The instant defendant argues that this approach is exceedingly burdensome since traditional product-liability law puts the burden of proof on plaintiffs. We are not convinced by defendant's argument. Public policy justifies shifting the burden of proof to a defendant because the manufacturer may be exempt from strict liability and because that defendant will invariably be expert in the field and have superior knowledge.

## B

### Failure to Warn

■ For the same reasons of public policy we reject plaintiff's assertion that a drug manufacturer should be held strictly liable for failure to warn of risks inherent in a drug even though it neither knew nor could have known by the application of scientific knowledge available at the time of distribution that the drug could produce the undesirable effects suffered by plaintiff. Instead we shall reaffirm our interpretation of comment j in *Thomas v. Amway Corp.,* 488 A.2d at 722. Under failure-to-warn analysis, a product is defective if the seller does not warn of the product's danger. *Id.* In *Thomas,* however, this court limited the failure-to-warn theory by ruling that a seller need only warn of those dangers that are reasonably foreseeable and knowable at the time of marketing. *Id.*

By requiring manufacturers to warn only of those dangers of which they had actual or constructive knowledge, the standard for failure to warn is equivalent to the standard for negligence. Although the test departs somewhat from the concept that underlies the doctrine of strict liability, we think that it would be absurd to require manufacturers to warn of dangers that, given the present state of scientific knowledge, are unknowable. *Feldman,* 97 N.J. at 454, 479 A.2d at 387; *see Thomas v. Amway Corp.,* 488 A.2d at 722. Also, imposing liability on manufacturers for unknowable dangers would make them virtual insurers of their products.

The application of this negligence standard, however, does not permit drug manufacturers completely to escape a higher standard of liability because they will be held to an expert standard of care. *Belle Bonfils Memorial Blood Bank,* 665 P.2d at 126; *Toner,* 112 Idaho at 338, 732 P.2d at 307; *Feldman,* 97 N.J. at 452–53, 479 A.2d at 386–87. In their capacity as experts they must carefully monitor the new developments and research that pertain to the

drugs that they manufacture. This high standard of care ensures that the public will be protected from dangers as those dangers are discovered. Liability will ensue, however, if a manufacturer fails to disclose dangers of which it should have known if it had vigorously monitored available information.

## II

### IMPLIED WARRANTY OF MERCHANTABILITY

 Rhode Island recognizes a cause of action for personal injuries based on breach of the implied warranty of merchantability. *Parrillo v. Giroux Co.*, 426 A.2d 1313 (R.I.1981). We have permitted suits on this theory for such products as a football helmet, *Fiske*, 464 A.2d at 725, and a bottle of grenadine, *Parrillo*, 426 A.2d at 1317. The plaintiff asserts that this theory should be available to Marilyn if she establishes the requisite elements.[5] The defendant argues, however, that this theory is the equivalent of strict liability in tort. It argues that it would be inconsistent for this court possibly to exempt prescription drugs from strict liability under comment k and to use the negligence standard to determine failure-to-warn liability while we perfunctorily permit plaintiff to recover under the theory of implied warranty. This would undermine public policy, and, therefore, we agree with Squibb's contention.

Other courts considering the issue also agree. *Belle Bonfils Memorial Blood Bank*, 665 P.2d at 126–27; *McMichael v. American Red Cross*, 532 S.W.2d 7, 11 (Ky.Ct.App.1975). These courts were presented with the issue of extending the comment-k defense, which sounds in tort, to the contract cause of action of implied warranty. They concluded that when an implied-warranty action cannot be distinguished from a strict-liability action under

§ 402A, a comment-k defense operates as a defense to implied-warranty claims because these two theories of liability express a single basic public policy. *Belle Bonfils Memorial Blood Bank*, 665 P.2d at 127; *McMichael*, 532 S.W.2d at 11.

We recognize that strict liability and implied warranty of merchantability are parallel theories of recovery, one in contract and the other in tort. *Parrillo*, 426 A.2d at 1317. On the facts presented in this case the two theories are indistinguishable. Although the concept embodied in comment k was developed as a defense to § 402A liability for design defect, logic requires us also to extend the defense to implied-warranty actions. We do not believe that the just outcome of a case should be determined by adroit pleading and semantic distinctions. *See Fiske v. MacGregor, Division of Brunswick*, 464 A.2d at 728 (pursuant to statute court extended comparative-negligence principles to damages awards on implied-warranty-of-merchantability actions for personal injuries). Therefore, if DES is deemed unavoidably unsafe under comment k, the manufacturer cannot be held liable for breach of its implied warranty of merchantability.

In conclusion, we recognize that the plaintiff has a cause of action based on the theories of strict liability in tort and breach of implied warranty of merchantability. The defendant can use comment k as a defense to claims of design defect and breach of implied warranty of merchantability. Comment k, however, is not a defense to an action alleging failure to warn. Furthermore, the defendant bears the burden of proving the comment-k defense.

---

**5.** In order to recover for an action for breach of implied warranty of merchantability a plaintiff must establish five elements. We listed these elements in *Electric Terminal Corp. v. Cessna Aircraft*, 520 A.2d 144, 146 (R.I.1987):

"'(1) that a merchant sold goods, (2) which were not "merchantable" at the time of sale, and (3) injury and damages to the plaintiff or his property (4) cause proximately and in fact by the defective nature of the goods, and (5)

notice to seller of injury.' White and Summers, *Uniform Commercial Code*, § 9–6 at 343 (2d ed. 1980). As to the fourth element, we have been careful to require that plaintiff prove more than 'the happening of an occurrence,' instead requiring a showing of 'the causal nexus between the happening of the occurrence and the alleged breach of the implied warranty of merchantability.' *Thomas v. Amway Corp.*, 488 A.2d at 719."