Judy AMORE and Gary Amore, her husband, Plaintiffs,

v.

G.D. SEARLE & CO., INC., et al., Defendants.

No. 88–710–CIV–WMH.

United States District Court, S.D. Florida.

Aug. 16, 1990.

John Elliot Leighton, Leesfield & Blackburn, P.A., Miami, Fla., for plaintiffs.

Carlton, Fields, Ward, Emmanuel, Smith, Cutler & Kent, P.A., Tampa, Fla., for defendants.

## ORDER

HOEVELER, District Judge.

This cause is before the Court on cross motions for summary judgment.

### I. INTRODUCTION

Plaintiffs Mr. and Mrs. Amore bring this suit for injuries that Mrs. Amore allegedly sustained through her use of an intrauterine copper contraceptive (hereinafter "Cu–7") manufactured by Defendant G.D.

Searle & Company. The Cu–7 is an intra-uterine copper contraceptive which is available to women on the prescription of a physician. It is inserted into a woman's uterus through the vagina and cervix, where it remains until removal by the physician.

In August 1977, Plaintiff Judy Amore had a Cu–7 inserted at the Coconut Grove Family Clinic in Miami, Florida. Since the Coconut Grove Family Clinic records were lost or destroyed, the name of the inserting physician is unknown.[1] Within 60–90 days of this insertion with the Cu–7, Plaintiff suffered an acute pelvic inflammatory disease (PID) which was treated with antibiotics.

In October 1980, Mrs. Amore had her Cu–7 replaced with a new one by Dr. Marilyn Marcus. In April 1984, Plaintiff had the Cu–7 removed in order to begin a family. After nearly a year of unsuccessful attempts at pregnancy, it was determined that Plaintiff had sustained chronic pelvic inflammatory disease (PID), which made conception all but impossible.

Now pending before the Court are cross motions for summary judgment, including Plaintiffs' motion based on collateral estoppel, as well as two motions by Defendants: the first based on the "learned intermediary doctrine", with the second directed at Plaintiff's claim for punitive damages.

## II. PLAINTIFFS' MOTION

■ Plaintiffs move for summary judgment on the issue of liability based on the doctrine of collateral estoppel since Defendant has been held liable on the issues presented now to this Court in the previous action of *Kociemba v. G.D. Searle & Co.,* 1988 WL 119676 (D.Minn., Civ. No. 3–85–1599, Sept. 13, 1988), *post-trial motions*

*denied,* 707 F.Supp. 1517 (D.Minn.1989). Quite correctly, Plaintiffs observe that the facts in *Kociemba* are virtually identical to the facts of *Amore.* Both women had the Cu–7 inserted for contraceptive purposes in the summer of 1977. Soon after insertion, both suffered from abdominal pains and were treated by their physicians with antibiotics. Both women continued to utilize the Cu–7 after their symptoms had dissipated, and did not have the device removed until they decided to have children. Finally, both women failed to conceive and were diagnosed as being infertile as a result of pelvic inflammatory disease.

The doctrine of collateral estoppel precludes a party from relitigating an issue that was fully litigated in a previous action. Three general requirements for application of the doctrine exist:

> (1) that the issue at stake be identical to the one involvd in the prior litigation;
>
> (2) that the issue have been actually litigated in the prior litigation; and
>
> (3) that the determination of the issue in the prior litigation have been a critical and necessary part of the judgment in that ealier action.

*Steelmet, Inc. v. Caribe Towing Corp.,* 747 F.2d 689 (1984). Yet even where these three requirements are met, the trial court must not allow the use of offensive collateral estoppel where an invocation of the doctrine would be fundamentally unfair. *Deweese v. Town of Palm Beach,* 688 F.2d 731, 734 (1982). As suggested by the Supreme Court in *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 330, 99 S.Ct. 645, 651, 58 L.Ed.2d 552 (1979), offensive collateral estoppel may be "unfair to the defendant if the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant."[2] *See also In re Bendectin*

---

1. *See* statement of Carmen Rivera, Exhibit "A" of Plaintiff's memorandum in opposition to summary judgment, and affidavit of Judy Amore, attached as Exhibit "B".

2. Professor Currie's familiar example is illustrative of the unfairness which would result in the application of collateral estoppel to the facts before the Court. In his example, a railroad collision injures 50 passengers all of whom

bring separate actions against the railroad. After the railroad wins the first 25 suits, a plaintiff wins in suit 26. The Professor concludes, and this Court agrees, that collateral estoppel should not be invoked to allow the remaining 24 plaintiffs automatically to prevail against defendant. *See* Currie, *Mutuality of Collateral Estoppel: Limits of the Bernhard Doctrine,* 9 Stan.L.Rev. 281 (1957).

*Products Liability Litigation,* 749 F.2d 300, 305 (6th Cir.1984) (offensive collateral estoppel inappropriate in mass tort litigation under *Parklane:*) *Setter v. A.H. Robins Co.,* 748 F.2d 1328, 1330 (8th Cir.1984) (where defendant IUD manufacturer had prevailed in 12 of 21 prior cases, "this factor alone is sufficient to persuade us that the district court did not abuse its discretion" in refusing to apply collateral estoppel); *Schnock v. A.H. Robins Co.,* CCH Prod. Liab. Rep. P. 10508 (E.D.N.Y. 1985) (collateral estoppel not applied because defendant had prevailed in other IUD cases); *Harrison v. Celotex Corp.,* 583 F.Supp. 1497, 1503 (E.D.Tenn.1984) (rejecting collateral estoppel where defendant product manufacturers had been successful in prior cases).

In the case at bar, Defendant Searle has prevailed in the majority of cases which have reached juries, obtaining favorable verdicts and judgments in fourteen of nineteen cases.[3] Accordingly, this Court finds that it would be patently unfair to award Plaintiffs summary judgment on the basis of collateral estoppel in this proceeding. Plaintiffs' motion is therefore denied.

## III. DEFENDANT'S MOTIONS

Defendant G.D. Searle presents three motions for summary judgment. First, Defendant moves for judgment on the issue of punitive damages. The Court hereby reserves ruling on this motion. Second, Defendant moves for summary judgment on the basis of the "learned intermediary doctrine" under which Defendant contends that it is not required to warn the patient of the risks associated with the Cu–7, but rather, must only provide adequate warnings to the medical community. Maintain-

ing that the record before the Court demonstrates that there is no controverted factual issues surrounding the adequacy of the warning to the medical community, Defendant concludes that it is entitled to summary judgment. Third, Defendant contends Counts IV and V of the complaint should be dismissed on the grounds that Defendant is not strictly liable to Plaintiffs under Florida law. Each argument is discussed in turn, below.

## A. STANDARD ON SUMMARY JUDGMENT

The standard to be applied in reviewing a summary judgment motion is stated unambiguously in Rule 56(c) of the Federal Rules of Civil Procedure:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

As set forth in the Rule, summary judgment may be entered only where there is *no* genuine issue of material fact. Moreover, the moving party bears the burden of meeting this exacting standard. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct 1598, 1608, 26 L.Ed.2d 142, 154 (1970).

In applying this standard, the Eleventh Circuit has explained that:

> In assessing whether the movant has met this burden, the courts should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. *Adickes,* 398 U.S. at 157, 90 S.Ct. at 1608; *Marsh,*

**3.** These cases include: *Perez v: G.D. Searle & Co.,* Civil Action No. 76–C–1239 (E.D.N.Y.1978); *Warshauer v. Searle Laboratories, and G.D. Searle & Co.,* Civil Action No. 80–2567–N (D.Mass.1982); *Kelly v. G.D. Searle & Co.,* Civil Action No. 82–C–912(S) (W.D.Wis.1983); *Cook v. G.D. Searle & Co.,* Civil Action No. 78–M–892 (D.Colo.1983); *Katzenmeyer v. Searle Medical Products, Inc.,* Civil Action No. C–83–1098–A (N.D.Ohio 1984); *Lear–Heflich v. G.D. Searle & Co.,* Civil Action No. 80–0309–F (D.Mass.1985); *Davis v. G.D. Searle & Co.,* Civil Action No. CV–F–83–458 (C.D.Cal.1985); *Marder v. G.D.* *Searle & Co.,* Civil Action No. Y–82–3506 (D.Md. 1986) (directed verdict); *Sires v. Searle Laboratories, etc. et al.,* Civil Action No. C–277317 (Cal. Super.Ct.1987); *Harris v. G.D. Searle & Co.,* Civil Action No. 86–4019 (W.D.Ark.1987); *Romero v. G.D. Searle & Co. et al.,* Civil Action No. CV–84–02244 (2d Dist.Ct., N.M.1987); *Turner v. G.D. Searle & Co.,* Civil Action No. C–83–281–L (N.H.1987); *McPheron v. Searle Laboratories, a division of Searle Pharmaceuticals, Inc.,* Civil Action No. 83–1109–A (M.D.La.1988) (directed verdict); *Nickerson v. G.D. Searle & Co.,* Civil Action No. 86–669–T (D.Mass.1989).

651 F.2d at 991. All reasonable doubts about the facts should be resolved in favor of the non-movant. *Casey Enterprises v. Am. Hardware Mutual Ins. Co.,* 655 F.2d 598, 602 (5th Cir.1981). If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial. *Marsh,* 651 F.2d at 991; *Lighting Fixture & Elec. Supply Co. v. Continental Insurance Co.,* 420 F.2d 1211, 1213 (5th Cir.1969). Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. *Lighting Fixture & Elec. Supply* 420 F.2d at 1213....

Moreover, the party opposing a motion for summary judgment need not respond to it with any affidavits or other evidence unless and until the movant has properly supported the motion with sufficient evidence. *Adickes v. S.H. Kress & Co.,* 398 U.S. at 160, 90 S.Ct. at 1609–10; *Marsh,* 651 F.2d at 991. The moving party must demonstrate that the facts underlying all the relevant legal questions raised by the pleadings or otherwise are not in dispute, or else summary judgment will be denied, notwithstanding that the non-moving party has introduced no evidence whatsoever. *Brunswick Corp. v. Vineberg,* 370 F.2d 605, 611–612 (5th Cir. 1967). *See, Dalke v. Upjohn Co.,* 555 F.2d 245, 248–49 (9th Cir.1977).

*Clemons v. Dougherty County, Ga.,* 684 F.2d 1365, 1368–1369 (11th Cir.1982).

In opposing a motion for summary judgment, the non-moving party may not rest upon mere allegations, but must rebut any facts presented by the moving party in order to demonstrate the existence of a genuine and material issue of fact for trial. *Adickes* 398 U.S. at 160, 90 S.Ct. at 1609–10, 26 L.Ed.2d at 156. Furthermore, the mere existence of a scintilla of evidence in support of the non-movant's position is insufficient; there must be evidence on which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 214 (1986). In determining whether this evidentiary threshold has been met, the trial court must "view the evidence presented through the prism of the substantive evidentiary burden" applicable to the particular cause of action before it. *Id.* 477 U.S. at 254, 106 S.Ct. at 2513, 91 L.Ed.2d at 215. If the non-movant fails to adduce evidence which would be sufficient, when viewed in a light most favorable to the non-movant, to support a jury finding for the non-movant, summary judgment may be granted. *Id.* 477 U.S. at 253, 106 S.Ct. at 2512–13, 91 L.Ed.2d at 215. Moreover, summary judgment is mandated, if after adequate time for discovery, the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party would bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323, 91 L.Ed.2d 265, 273 (1986).

## B. THE "LEARNED INTERMEDIARY" DOCTRINE

As a general rule, the manufacturer of a product has a duty to warn the users of dangers inherent in the use of that product. One exception to this rule, however, is the "learned intermediary" doctrine, whereby a the manufacturer of a prescription drug discharges its duty to warn by providing an adequate warning to the prescribing physician. As noted by the Eighth Circuit:

> There are several arguments supporting the application of this exception to prescription drug products. First, medical ethics and practice dictate that the doctor must be an intervening and independent party between the patient and drug manufacturer. Second, the information regarding risks is often too technical for a patient to make a reasonable choice. Third, it is virtually impossible in many cases for a manufacturer to directly warn each patient.

*Hill v. Searle Laboratories,* 884 F.2d 1064, 1070 (8th Cir.1989). Although the "learned intermediary" exception has been questioned and rejected in the context of birth

control devices by some courts,[4] the doctrine continues to enjoy solid support under Florida law. In the case of *Buckner v. Allergan Pharmaceuticals, Inc.*, 400 So.2d 820 (Fla.App.1981), the court held that a manufacturer of prescription drugs is only under a duty to warn the medical community:

> A manufacturer of a dangerous commodity, such as a drug, does have a duty to warn but when the commodity is a prescription drug we hold that this duty to warn is fulfilled by an adequate warning given to those members of the medical community lawfully authorized to prescribe, dispense and administer prescription drugs.

*Buckner* at 822 (citations omitted). As the Florida Supreme Court recently stated in the case of *Felix v. Hoffmann–LaRoche, Inc.*, 540 So.2d 102 (Fla.1989):

> [I]t is clear that the manufacturer's duty to warn of [the drug's] dangerous side effects was directed to the physician rather than the patient. *Buckner v. Allergan Pharmaceuticals, Inc.*, 400 So.2d 820 (Fla. 5th DCA), *review denied*, 407 So.2d 1102 (Fla.1981). This is so because the prescribing physician, acting as a "learned intermediary" between the manufacturer and the consumer weighs the potential benefits against the dangers in deciding whether to recommend the drug to meet the patient's needs. *Reyes v. Wyeth Laboratories*, 498 F.2d 1264, 1276 (5th Cir.), *cert. denied*, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974).

Thus, in Florida, the manufacturer of a prescription drug must provide the prescribing physician with an adequate warning. The properly warned physician then becomes a "learned intermediary" operating to break the causal link between the manufacturer and plaintiff, thereby insulating the manufacturer from tort liability for harm caused by the drug.

Defendant presents two points for consideration in light of the learned intermediary doctrine. First, Defendant claims that the warning provided to the physician with the Cu–7 was so clear and unambiguous that Defendant's duty to warn the medical community has been discharged as a matter of law. Alternatively, Defendant argues that even if the warnings were not so clear as to warrant judgment for Defendants as a matter of law, Defendant is nevertheless entitled to summary judgment since a factual evaluation demonstrates that the warnings to the medical community were adequate.[5]

### 1. The Warnings Supplied By Defendant

Each Cu–7 purchased by a physician is accompanied by a "package insert", which provides instructions on insertion and warnings regarding potential health risks. Under the heading "warnings", the instert provides:

> *Pelvic Infection:* An increased risk of pelvic inflammatory disease associated with the use of IUDs has been reported. While unconfirmed, this risk appears to be greatest for young women who are nulliparous and/or who have a multiplicity of sexual partners. Salpingitis can result in tubal damage and occlusion, thereby threatening future fertility. Therefore it is recommended that patients be taught to look for symptoms of

---

**4.** For example, the Michigan courts have concluded that contraceptives should not be subject to the learned intermediary doctrine because the use of contraceptives, unlike most prescription drugs, is initiated and directed by the patient, not the physician. This increased role of the patient has caused the manufacturers to direct their literature at prospective patients, creating a consumer/producer relationship for which the reasoning of the learned intermediary doctrine is inapplicable. *See, e.g., Odgers v. Ortho Pharmaceutical Corp.*, 609 F.Supp. 867 (E.D.Mich.1985); *Stephens v. G.D. Searle & Co.*, 602 F.Supp. 379 (E.D.Mich.1985).

**5.** It should be noted that under normal circumstances, Defendant could further argue under the learned intermediary doctrine that even were the warnings inadequate, it is nevertheless not liable to Plaintiff since the prescribing physician was independently apprised of the risks associated with use of the Cu–7. However, in the case at bar, the identity of the prescribing physician is unknown, thus precluding Defendant's reliance on this prong of the learned intermediary doctrine.

pelvic inflammatory disease. The decision to use an IUD in a particular case must be made by the physician and patient with the consideration of a possible deleterious effect on future fertility.

Under a section entitled "adverse reactions," the insert provides:

Pelvic infection, including salpingitis with tubal damage or occlusion has been reported. This may result in future infertility.

Defendant is also required by the Food and Drug Administration to furnish the physician with a patient brochure with each Cu–7.[6] The patient brochure warns the patient about pelvic infection and that it "could decrease future chances of getting pregnant or even prevent it and require major surgery." The brochure further cautions that:

Some adverse reactions and side effects are very serious and occur rarely, whereas others are less serious, common with IUDs, and transient. Ask your doctor to tell you what the approximate severity, frequency, and duration ar for the various adverse reactions and side effects.

The adverse reactions listed include "pregnancy outside the uterus (ectopic pregnancy, for example, in the fallopian tube or ovary) usually requiring surgery. Then, in capital letters, the brochure warns:

PELVIC INFECTION INCLUDING INFLAMMATION OF THE FALLOPIAN TUBES, WHICH MAY DAMAGE OR BLOCK THEM. (THIS COULD DECREASE FUTURE CHANCES OF GETTING PREGNANT OR EVEN PREVENT IT AND REQUIRE MAJOR SURGERY).

In a subsequent section of the patient's brochure entitled "Warnings", pelvic infection is discussed in more detail:

Pelvic infections have been reported following insertion of a Cu–7. These can occur anyway, but it is certainly possible for the Cu–7 to pick up germs in the vagina and carry them into the uterus on insertion. Even though the Cu–7 is pack-

aged sterile and aseptic techniques are used, the vagina is not sterile....

An increased risk of pelvic infection associated with the use of IUDs has been reported. While unconfirmed, this risk appears to be greatest for young women who have never had a baby and/or who have many sexual partners. Pelvic infection can be severe and result in abscesses of the ovaries and tubes or in general peritonitis. Pelvic infection may include inflammation of the fallopian tubes, which can become damaged and blocked. This could decrease future chances of getting pregnant or even prevent it and require major surgery.... The decision to use an IUD in a particular case must be made by the woman and her doctor with the consideration of a possible deleterious effect on future fertility.

2. *Adequacy of the Warnings as a Matter of Law*

As noted above, a drug manufacturer will not be held liable in Florida where it can show that it provided the medical community with an adequate warning of the risks associated with the product. In the case of *Felix v. Hoffmann–LaRoche, Inc.*, 540 So.2d 102, 105 (Fla.1989), the Florida Supreme Court stated that although the adequacy of warnings concerning drugs is normally a question of fact, it can "become a question of law where the warning is accurate, clear and unambiguous." The *Felix* Court found that the manufacturer's warning concerning acne medication was adequate as a matter of law where it warned physicians that the product should *not* be prescribed to "patients who are pregnant or intend to become pregnant while undergoing treatment." *Felix*, 540 So.2d at 103 (emphasis supplied). Unlike the categorical negative—"should not be prescribed"—present in the *Felix* warning, the warning accompanying the Cu–7 merely warns of that "[a]n increased risk of pelvic infection associated with the use of IUDs has been reported". The warning continues that "[w]hile unconfirmed, this risk appears to be greatest for young wom-

**6.** *See* 21 C.F.R. Sec. 310.502(b)(1).

en who have never had a baby ...". Far from a model of clarity, the Cu–7 warning is the very example of a qualified warning, the adequacy of which must be resolved through a highly intensive factual inquiry. It is into the first stage of this factual inquiry that the Court now embarks.

### 3. *Factual Evaluation of the Warnings on Summary Judgment*

■ Failing to show adequacy as a matter of law, Defendant claims that as a factual matter, the warning supplied with the Cu–7 adequately apprised the medical community of the risks associated with the product.

The Cu–7 warning does mention the risks entailed in the use of the CU–7, but states merely that incidents of pelvic inflammatory disease (PID) have been "reported", and that the reports of such problems are "unconfirmed". In opposition to Defendant's assertion that these warnings are adequate, Plaintiff submits the affidavit of Dr. Harvey Bank, an associate professor at the Department of Pathology of the Medical University of South Carolina, who testifies that the design of the Cu–7, specifically the tailstring, was defective, and that its deficiencies were not indicated in the warning. Additionally, Dr. Bank comments that the risks of PID and subsequent infertility as reported in Defendant's literature mischaracterized the relationship and incidence of PID that Defendant knew or should have known existed:

> Searle's labelling involved in this case ... does not contain information on the aforementioned string defects, nor does it state that a cause and effet relationship (as opposed to an associative, coincidental) actually exists between the use of the device and some cases of infection, and pelvic inflammatory disease. Neither does any labelling contain adequate explanation of severity of the hazards of pelvic inflammatory disease....

Affidavit of Dr. Harvey Bank, paragraph 7(h).

A second expert witness for Plaintiff, Dr. William Edward O'Malley states that:

> 6. From my review of the clinical testing protocols and labeling for the Cu–7, it is my opinion that Searle has insufficient basis to state, as it did in its labelling for the Copper 7 involved in this case, that certain reactions to the Copper 7, such as infection, spontaneous abortion and septic abortion, were "rare."

> 9. The term "association" and its derivatives, as used in pharmaceutical labeling, is a term of art which is generally accepted within the industry to imply a coincidental occurrence as opposed to a cause and effect relationship. Therefore, Searle does not state in its labelling ... that there is a cause and effect relationship between infection and the use of the Copper 7.

> 10. It is my opinion that there is a cause and effect relationship between use of the Cu–7 and development of pelvic inflammatory disease.

> 11. Assuming that there is a cause and effect relationship between use of the Copper 7 and infection and other associated infectuous side effects, and the same was known to Searle prior to the introduction of the device into the Plaintiff, Searle's failure to include that cause and effect relationship in its labelling would, in my opinion, represent a deviation from the standard custom and practice in the pharmaceutical industry at the time, let alone the requirements of the Federal Food and Drug Administration. At the very least, it would constitute misleading behavior on the part of Searle.

> 12. Assuming that there is only an associational relationship between use of the Cu–7 and plevic inflammatory disease, the "warnings" given by Searle were, in my opinion, insufficient to properly advise physicians and users of the gravity and seriousness of the consequences....

Affidavit of William Edward O'Malley Ph.D., M.D., paragraphs 6, and 9–12.

As demonstrated by these affidavit excerpts, Plaintiff has successfully raised disputed issues of material fact sufficient to defeat Defendant's motion for summary judgment on the issue of the adequacy of the warnings.

## C. STRICT LIABILITY AND THE APPLICABILITY OF COMMENT K

■ Having adopted section 402A of the Restatement (Second) of Torts, Florida imposes strict liability upon manufacturers for unavoidably dangerous products which are sold with the knowledge that they are to be used by consumers without any inspection by them for defects. *West v. Caterpillar Tractor Co.*, 336 So.2d 80, 86 (Fla. 1976). However, Florida has adopted Comment k to Section 402A, which creates an exception to strict liability for products which are "incapable of being made safe" provided that they are "properly prepared" and marketed with a "proper warning":

There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is unreasonably dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desireable product, attended with a known but apparently reasonable risk.

■ Defendant argues that Comment k operates to exempt the Cu–7 from strict liability. Plaintiffs, however, contend that the Cu–7 does not fall within the scope of Comment k, on the grounds that Comment k should apply only to drugs which are "incapable of being made safe" such as a rabies vaccine, and not to common drugs such as birth control devices. The approaches taken by Courts facing the question of whether or not a certain product is encompassed by Comment k have followed two distinct paths. Many Courts have concluded that Comment k is applicable to all prescription drugs. *See, e.g., Lindsay v. Ortho Pharmaceutical Corp.*, 637 F.2d 87 (2d Cir.1980); *Brown v. Superior Court*, 44 Cal.3d 1049, 245 Cal.Rptr. 412, 751 P.2d 470 (1988); *McKee v. Moore*, 648 P.2d 21 (Okl.1982); *Terhune v. A.H. Robins Co.*, 90 Wash.2d 9, 577 P.2d 975, 977–78 (1978). Other Courts, however, have limited the application of Comment k to "circumstances when it is shown that the product is incapable of being made safe given the present state of human knowledge but possesses such a high degree of social need so that its use is warranted provided warnings are adequate." *Hill v. Searle Laboratories*, 884 F.2d 1064, 1068 (8th Cir.1989) (holding that whether a product is within Comment k should be determined on a case by case basis where it is shown that the product is unavoidably unsafe *and* product of "exceptional social need"); *see also, Wheelahan v. G.D. Searle & Co.*, 814 F.2d 655 (4th Cir.1987); *Coursen v. A.H. Robins Co.*, 764 F.2d 1329, 1337 (9th Cir.1985); *Kociemba v. G.D. Searle & Co.*, 680 F.Supp. 1293, 1301 (D.Minn.1988); *Patten v. Lederl Laboratories*, 676 F.Supp. 233 (D.Utah 1987); *Hawkinson v. A.H. Robins Co., Inc.*, 595 F.Supp. 1290, 1303 (D.Colo. 1984).

One obvious appeal of adopting the bright-line rule that all prescription drugs are protected by Comment k is that such a rule would avoid the necessity of making difficult decisions as to which drugs are

unavoidably unsafe, and which ones could be made safer. Yet however expedient such a clear-cut rule might be, this interpretation of Comment k would appear to be rejected by the clear wording of the Comment itself. Rather than simply stating that all prescription drugs are within its domain, Comment k explicitly specifies three prerequisites which must be met before a product falls within its protection. First, the product must be "incapable of being made safe." Second, the product must be "properly prepared and marketed". Third, a "proper warning" must be given. Applying Comment k to all prescription drugs completely ignores these three expressly stated prerequisites. Moreover, as noted by the Eighth Circuit in *Hill, supra* at 1069, such a blanket exception to strict liability for all prescription drugs was proposed at the American Law Institute meeting where section 402A and Comment k were adopted, but this proposal was defeated. 38 ALI Proc. 19, 90–98 (1961). Indeed, the example provided in the body of Comment k—Pasteur's rabies vaccination—indicates that Comment k was designed to apply to drugs which are unavoidably unsafe, but are nonetheless desireable for use in treating an affliction with greater destructive effects. In contrast to the example of the rabies vaccination, the Cu–7 is not the *sine qua non* of birth control, but only one alternative amongst a host of competing products. In Florida, this interpretation finds support in the case of *Russell v. Community Blood Bank, Inc.,* 185 So.2d 749, 755 (Fla.App. 1966), and in the case of *McLeod v. W.S. Merrell Co., Div. of Richardson–Merrell,* 174 So.2d 736 (Fla.App.1965), where the court stated that before applying Comment k, it was necessary for the court to find that the product was "unavoidably unsafe".

Thus, this Court concludes that in order to avail itself of the affirmative defense to strict liability provided by Comment k, a defendant must satisfy that following three requisite elements: that the drug be (1) incapable of being made safe; (2) properly prepared and marketed; and, (3) accompanied by a proper warning. As to the first and second elements, although the Court suspects that they both can be demonstrably satisfied without difficulty, the record presented is insufficient to support a finding that the Cu–7 was incapable of being made safe and was in fact properly prepared to specifications. Concerning the final element, (as discussed in Section III–B–3 above), scrutiny of the record reveals that the issue of the adequacy of the warning is plagued with far too many controverted issues of fact to be susceptible to summary disposition at this time.

## IV. CONCLUSION

In light of the above discussion, this Court hereby:

1. Denies Plaintiffs' motion for summary judgment on the basis of collateral estoppel.

2. Denies Defendant G.D. Searle's motion for summary judgment on the issues of causation and the adequacy of the warning.

3. Reserves ruling on Defendant Searle's motion concerning punitive damages.

DONE AND ORDERED.